THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
ANTHONY JOSEPH FIORELLO, DEFENDANT-RESPOND-
ENT.

Argued September 25, 1961—Decided November 6, 1961.

*Mr. Michael R. Imbriani,* Assistant Prosecutor of Somerset County, argued the cause for the appellant (*Mr. Arthur S. Meredith,* Somerset County Prosecutor, attorney).

*Mr. John F. Ryan* argued the cause for the respondent (*Messrs. Ryan, Saros, Davis & Stone,* attorneys; *Mr. Bernard L. Davis,* on the brief).

The opinion of the court was delivered by

JACOBS, J. The defendant was found guilty of book-making by a Somerset County jury and, after the denial of his motion for a new trial, was duly sentenced by Judge Halpern. The Appellate Division reversed and remanded the cause for further proceedings. We certified on the State's application. 34 *N. J.* 472 (1961).

On January 9, 1960, Investigator Martin and Detective Karkowski of the New Jersey State Police went to the defendant's gasoline service station in North Plainfield. They had a search warrant and made a search of the premises. In the course thereof, Investigator Martin searched the defendant and asked him to place everything in his pockets on a nearby cigarette machine. This was apparently done and the investigator testified that "there was nothing left" in the defendant's pockets. Included among the items from the defendant's pockets were two slips of paper which were marked as Exhibits S–1 and S–2. They were in the defendant's handwriting and contained lists of numbers preceded by letters. While the search of the premises was going on the telephone rang on two occasions and Investigator Martin answered the calls. The first caller asked for Tony and when he was told that Tony was not available, he said that if he

could not talk to Tony he did not want to talk to anyone. The second call, more than an hour later, was from a person who identified himself as Freddie, the brother-in-law of Tony. He said that if he could not talk to Tony, he did not want to talk to anyone. The defendant at the time told the investigator that he had no brother-in-law named Freddie.

The investigator testified that after he had answered the first telephone call and while he had his back to the defendant, he heard a crackling of paper. He turned around and saw that the defendant had his hands folded behind his back. He then "grabbed" the defendant's left hand and when the defendant's hand was opened "there was a slip of paper in his palm"; this was received in evidence and marked as Exhibit S–3. The slip was in the defendant's handwriting and contained information which the defendant said he had obtained from the *Newark Star Ledger*. When the investigator asked the defendant what the information on the slip represented, the defendant stated that the list of names on the slip represented teams, the numbers next to them represented point spreads and the next notations were the times that the games were to be played. When the investigator asked the defendant why he had not put S–3 on the cigarette machine along with S–1 and S–2, the defendant said that he "didn't know it was in his pocket at that time." On cross-examination the investigator repeated his earlier testimony that he had searched the defendant's pockets thoroughly and that S–3 was not there at the time. When the defendant's wallet was searched it was found to contain $164 in bills and $1 in change.

 Detective Karkowski testified that since 1954 he had conducted numerous gambling investigations for the State Police and was familiar with the records, symbols and writings used in connection with bookmaking. He stated that Exhibits S–1 and S–2 could represent tally or record sheets and that Exhibit S–3 could represent "what is commonly known as a line sheet." He described a line sheet as a slip of paper or a prepared form which gives the names of "the

favorite teams or any teams playing in sporting contests"
and "usually the names are followed by points which are the
points that that particular team is favorite to win the con-
test by." When asked by counsel whether S-3 could repre-
sent anything other than a line sheet he said, "In my opinion,
it's nothing but a line sheet with the added feature of having
apparent time records made for each contest. That is the
time those games were scheduled to be played, to begin to
be played." In response to an inquiry from the court, the
detective reasserted that in his opinion S-3 was a line sheet
and could not represent anything else but a line sheet. The
detective testified that he examined S-3 and checked it against
the *Newark Star Ledger;* he found that the information in
the *Ledger* did not correspond with the information on S-3
and that the newspaper did not carry most of the starting
times. In response to an inquiry from the court as to whether
S-1 and S-2 could represent anything other than tally or
record sheets, the detective testified that they resembled tally
sheets or records of gambling activities which he had seen in
the past, but they could represent other records. When he
was asked whether they could represent other records which
have nothing at all to do with betting, he said, "It's a
possibility, yes, sir."

After Investigator Martin and Detective Karkowski had
testified, the State closed its case. Thereupon the defendant
moved for acquittal of the offenses charged in the two counts
set forth in the indictment. The court granted the de-
fendant's motion as to the second count which charged the
defendant with keeping a place to which persons might resort
for gambling. It denied the motion as to the first count
which charged that the defendant had, on January 9, 1960
and on other days, conducted the practice commonly known
as bookmaking in violation of *N. J. S.* 2A:112-3. On his
own case the defendant testified that he was not engaged in
the practice of bookmaking. He stated on direct examina-
tion that the items listed on S-3 were "basketball odds"
which he had taken from the newspaper and that he "was

going to see one of these games at either the Madison Square Garden or at Philadelphia." However, on cross-examination it was brought out that of the five games listed on S–3, one was played in Illinois, another in Ohio, another in Missouri, and another in the South. With respect to the fifth game, the evidence was silent as to where it was actually played, but there was proof that it could not have been played at Madison Square Garden. In response to an inquiry on direct examination as to what the figures on S–2 represented, the defendant testified that they were "figures of various things that I had taken down." He stated that he did not recall all of them but that he knew that "one here, S–67, could pertain to—I owed somebody $67.00, the S & H Green Stamps, and I know that B–95 was money that I had given to somebody and I kept a notation of it, and things like that." However, on cross-examination he stated that he could not tell what the "B" stood for. The defendant testified that S–1 was merely a duplication of S–2 but on cross-examination he acknowledged that only one of the six numbers on the exhibits was the same. The many contradictions in the defendant's testimony indicated his lack of credibility and, in addition, he admitted that he had been convicted in Union County in 1949 for bookmaking and maintaining premises for gambling purposes, and in Somerset County in 1957 for bookmaking and keeping a gambling resort. At the close of all of the testimony the court delivered its charge and after due deliberation the jury returned its verdict of guilty.

In the Appellate Division the defendant attacked his conviction on various grounds which were passed upon in the court's opinion. It summarily rejected the defendant's contention that while *N. J. S.* 2A:112–3 prohibits the practice of bookmaking on horseraces, it does not prohibit the practice of bookmaking on other contests such as basketball games. The Appellate Division's ruling on this issue was clearly correct and is not now questioned by the defendant. See *State v. Maranz*, 18 *N. J. Super.* 478 (*App. Div.*

1952), certification denied 10 *N. J.* 309 (1952). The Appellate Division also rejected the defendant's contention that Judge Halpern committed prejudicial error when he charged the jury that it was not necessary that the defendant be a principal but that it was sufficient if the jury found "from all of the proof beyond a reasonable doubt" that the defendant "knowingly and intentionally aided, abetted or participated in the prohibited practice of bookmaking." The defendant now attacks the Appellate Division's ruling on this issue but we find no merit whatever in his attack. Bookmakers and those who aid and abet them are equally condemned by the policy of our law and are all dealt with as principals. See *Paterson Publishing Co. v. N. J. Bell Telephone Co.,* 21 *N. J.* 460, 465 (1956); *State v. Morano,* 134 *N. J. L.* 295, 301 (*E. & A.* 1946). Under the proofs and under an entirely fair charge, the jury found that the defendant was guilty of engaging in the practice of bookmaking. Any involvement of others was immaterial and would not have constituted a defense; in this connection it may be noted that the trial court explicitly charged that a bettor as such was not guilty of any crime under *N. J. S.* 2A:112–3 and clearly the jury would not have found the defendant guilty of bookmaking if it had believed that he was simply a bettor. In any event, the reference to aiding and abetting did not prejudice the substantial rights of the defendant and was not reversible error. *Cf. State v. Western Union Telegraph Co.,* 12 *N. J.* 468, 495 (1953), appeal dismissed, 346 *U. S.* 869, 74 *S. Ct.* 124, 98 *L. Ed.* 379 (1953).

 The defendant contends that the evidence at the close of the State's case was insufficient to go to the jury and that his motion for acquittal at that time should have been granted by the trial judge. It is this contention which was accepted by the Appellate Division and led it to reverse the judgment of conviction. Our courts have held that the validity of the denial of a motion to acquit at the end of the State's case is to be tested in the light of the evidence at that time without reference to any corroborative evidence

introduced during the defendant's case. See *State v. Fox,*
12 *N. J. Super.* 132, 135 (*App. Div.* 1951); *State v. Pincus,*
41 *N. J. Super.* 454, 458 (*App. Div.* 1956); *cf. State v.
O'Shea,* 28 *N. J. Super.* 374, 378 (*App. Div.* 1953), affirmed,
16 *N. J.* 1 (1954). Although there are many cases else-
where which have in effect reached a different result (see,
*e. g., United States v. Calderon,* 348 *U. S.* 160, 164, 75 *S. Ct.*
186, 99 *L. Ed.* 202, 207 (1954); *United States v. Kenny,*
236 *F. 2d* 128, 131 (3 *Cir.* 1956), *certiorari* denied, 352
*U. S.* 894, 77 *S. Ct.* 133, 1 *L. Ed. 2d* 87 (1956); Annot.,
17 *A. L. R.* 910, 925 (1922)), we may, for present pur-
poses, assume the validity of the holdings in our courts, al-
though we hasten to point out that under them the State
is admittedly entitled to the benefit of all of its favorable
testimony and the favorable inferences which a jury might
reasonably draw therefrom. *Cf. State v. Rhams,* 14 *N. J.*
282, 285 (1954); *State v. Cerce,* 22 *N. J.* 236, 246 (1956);
*State v. Dancyger,* 29 *N. J.* 76, 84 (1959), *certiorari* denied,
360 *U. S.* 903, 79 *S. Ct.* 1286, 3 *L. Ed. 2d* 1255 (1959).

Various expressions of the test to be applied in passing
on a motion for acquittal may be found in the cases. In
*State v. Picciotti,* 12 *N. J.* 205, 208–209 (1953), the test
was stated to be "whether there is any legal evidence before
the jury from which an inference of guilt can be legitimately
drawn." See also *State v. Smith,* 32 *N. J.* 501, 521 (1960),
*certiorari* denied, 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d*
367 (1961); *State v. Kollarik,* 22 *N. J.* 558, 564 (1956);
*State v. Rogers,* 19 *N. J.* 218, 232 (1955); *State v. Begyn,*
58 *N. J. Super.* 185, 193 (*App. Div.* 1959), affirmed, 34 *N. J.*
35 (1961). The test has often been stated without any dis-
tinction between direct and circumstantial evidence. How-
ever, in *State v. Donohue,* 2 *N. J.* 381, 390 (1949), the
court expressed the sweeping view that where the State's
evidence is circumstantial, "all of the circumstances not
only must concur to indicate a defendant's guilt but they
must also be inconsistent with any other rational conclusion,"
and they must exclude "every other hypothesis except that

of guilt." Although this broad expression has been occasionally restated it has not been applied literally; if it were it would have unreasonably defeated many legitimate prosecutions based on circumstantial evidence where it was possible "to devise speculative hypotheses consistent with defendant's innocence." See *People v. Sullivan*, 22 *Ill. 2d* 122, 174 *N. E. 2d* 860, 861 (1961). The formulation found in *Donohue* has been effectively criticized elsewhere (see *United States v. Valenti*, 134 *F. 2d* 362, 364 (2 *Cir.* 1943), *certiorari* denied, 319 *U. S.* 761, 63 *S. Ct.* 1317, 87 *L. Ed.* 1712 (1943)), has been restrictively explained (*State v. Bulna*, 46 *N. J. Super.* 313, 317 (*App. Div.* 1957), affirmed, 27 *N. J.* 93 (1958))[1] and has been abandoned in recent opinions by our courts. See *State v. Goodman*, 9 *N. J.* 569, 581 (1952); *State v. Dancyger, supra*, 29 *N. J.*, at *p.* 84; *State v. Graziani*, 60 *N. J. Super.* 1, 13 (*App. Div.* 1959), affirmed, 31 *N. J.* 538 (1960), *certiorari* denied, 363 *U. S.* 830, 80 *S. Ct.* 1601, 4 *L. Ed. 2d* 1524 (1960); *State v. Hall*, 55 *N. J. Super.* 441, 447 (*App. Div.* 1959).

In *Goodman, supra*, the defendants were convicted on a charge of conspiracy to extort and their appeal was heard

----

[1] In *Bulna*, the court suggested that the *Donohue* formula may be a proper one for application by the jury. However, we consider the better approach to be that taken in *Holland v. United States*, 348 *U. S.* 121, 75 *S. Ct.* 127, 99 *L. Ed.* 150 (1954), where the court sustained a trial judge's refusal to instruct that where the government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt; after noting that where the jury is properly instructed on standards for reasonable doubt, such additional instruction on circumstantial evidence may be confusing, Justice Clark had this to say:

"Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." 348 *U. S.*, at *p.* 140, 75 *S. Ct.*, at *p.* 137, 99 *L. Ed.*, at *pp.* 166–167

in this court. Their motion for acquittal at the close of the State's case had been denied, and this action was readily sustained though it was acknowledged that the evidence was circumstantial and certain of the defendants' actions which were relied upon by the State, when isolated from other circumstances, appeared innocent. In the course of its opinion this court, citing *United States v. Valenti, supra,* stated that the real question at the close of the State's case "was whether the evidence, viewed in its entirety, was such that the jury could properly find therefrom, beyond reasonable doubt, that the four defendants had corruptly agreed to extort." 9 *N. J.,* at *p.* 581. In *Dancyger, supra,* the defendant was charged with theft of a ring. At the close of the State's case he moved for acquittal but his motion was denied and the jury later found him guilty. On appeal he urged that the evidence "did not exclude a reasonable hypothesis of innocence of the theft charge" and that he was therefore entitled to acquittal. In rejecting this contention Justice Proctor, writing for the entire court, pointed out that if the evidence was of sufficient quality to convince a jury beyond a reasonable doubt of the defendant's guilt it did not matter that it was circumstantial; citing *Goodman,* he stated that the question before the trial court at the close of the State's case was "whether the evidence, viewed in its entirety and giving the State the benefit of all the legitimate inferences therefrom, was such that the jury could properly find beyond a reasonable doubt" that the defendant had stolen the ring. 29 *N. J.,* at *p.* 84.

In *State v. Hall, supra,* the test set forth in *Dancyger* was applied to sustain the denial of a motion to acquit where charges of breaking and entering and larceny were supported by circumstantial evidence. In *State v. Graziani, supra,* the defendants were convicted of unlawfully conspiring to obtain money by false pretenses. They had moved for acquittal at the end of the State's case on the ground that the evidence against them was circumstantial and "did not exclude every reasonable hypothesis except that of guilt." In sustaining

the trial court's denial of their motion to acquit, the Appellate Division accurately set forth the now controlling approach:

"The issue for the trial court and for us is not whether the circumstantial evidence excluded every reasonable hypothesis except that of guilt. *State v. Bulna*, 46 *N. J. Super*. 313, 317 (*App. Div.* 1957), affirmed 27 *N. J.* 93 (1958). The issue to be decided is instead whether the evidence before the trial court, viewed in its entirety, and giving the State the benefit of all legitimate inferences therefrom, was such that the jury could properly find, beyond a reasonable doubt, that the defendants had corruptly agreed to obtain money by false pretenses from purchasers and prospective purchasers of motor vehicles. This is the accepted standard by which to test the propriety of the trial court's ruling on defendants' motions. *State v. Goodman*, 9 *N. J.* 569, 581 (1952) ; *State v. Dancyger*, 29 *N. J.* 76, 84 (1959) ; *State v. Hall*, 55 *N. J. Super*. 441, 447 (*App. Div.* 1959)." 60 *N. J. Super*., at p. 13

See *United States v. Giuliano*, 263 *F. 2d* 582, 584 (3 *Cir.* 1959) ; *White v. United States*, 279 *F. 2d* 740, 748 (4 *Cir.* 1960), *certiorari* denied, 364 *U. S.* 850, 81 *S. Ct.* 96, 5 *L. Ed. 2d* 74 (1960) ; *cf. United States v. Costello*, 221 *F. 2d* 668, 671 (2 *Cir.* 1955), affirmed, 350 *U. S.* 359, 76 *S. Ct.* 406, 100 *L. Ed.* 397 (1956) ; but see *Riggs v. United States*, 280 *F. 2d* 949, 953–955 (5 *Cir.* 1960). Compare *Holland v. United States*, 348 *U. S.* 121, 139–140, 75 *S. Ct.* 127, 99 *L. Ed.* 150, 166–167 (1954) with *State v. Bulna, supra*, 46 *N. J. Super*., at p. 317; see also Goldstein, "The State and the Accused: Balance of Advantage in Criminal Procedure," 69 *Yale L. J.* 1149, 1152–1163 (1960) ; Note, "Sufficiency of Circumstantial Evidence in a Criminal Case," 55 *Colum. L. Rev.* 549, 550 (1955).

When the trial court was called upon to determine whether the State, on its own case, had presented enough evidence to go to the jury, it was properly governed by the aforementioned standard. Its obligation was to view the State's evidence in its entirety, giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom. Viewing the evidence in that light, the trial court was satis-

fied that a reasonable jury could find beyond a reasonable doubt that the State had established that the defendant did conduct the practice of bookmaking as charged in the indictment. That being so, its duty was to deny the motion for acquittal and thereafter receive the testimony in support of the defense. We are convinced that its action in denying the motion was soundly taken. The State's expert witness testified that he was familiar with writings connected with bookmaking, that S–3 was a line sheet bearing the names, point spreads and starting times of basketball games, and that S–1 and S–2 could be tally or record sheets. It may fairly be inferred from the evidence, that during the search of the premises the defendant had concealed S–3, which was in his own handwriting, and was seeking to suppress it. Such attempt to suppress was an evidential circumstance which tended to establish guilt and negate any suggested inference that the possession of the line sheet was innocent. See *State v. De Falco,* 8 *N. J. Super.* 295, 299–300 (*App. Div.* 1950); *State v. O'Shea, supra,* 28 *N. J. Super.,* at *p.* 377. In addition, the State's case contained evidence that the defendant had falsely stated at the time that S–3 merely contained information which had been copied from the *Star Ledger. Cf. Commonwealth v. Lettrich,* 346 *Pa.* 497, 31 *A.* 2*d* 155, 156 (1943), where the court noted that an accused's fabrication "for the sake of diverting inquiry or casting off suspicion" is a circumstance "indicatory of guilt."

The State's expert witness testified that S–1 and S–2, which were also in the defendant's own handwriting, could be tally or record sheets, and that they resembled tally sheets or records found during gambling investigations he had conducted in the past. The defendant points out that the witness did not state that S–1 and S–2 were tally or record sheets, or were probably such, but simply stated that they could be such. He urges that this testimony should have been excluded by the trial court but we consider that under the circumstances the evidence was properly received. While the witness acknowledged the possibility that S–1 and S–2

might be unrelated to gambling, his acknowledgment was simply an admission of something self-evident, for S–1 and S–2 merely contained an enumeration of letters and figures and no one could truthfully deny the possibility that they might be records of legitimate transactions. S–1 and S–2 were in themselves proper evidential items (*cf. State v. Marlinek*, 12 *N. J. Super.* 320, 323–324 (*App. Div.* 1951)), they were not to be viewed in isolation (*cf. State v. Rhams, supra*, 14 *N. J.*, at *p.* 285), and when coupled with all the other circumstances in the case and particularly with S–3, a jury could reasonably infer that they were tally or record sheets being used in a bookmaking operation. The ingenuity of bookmakers and the sparcity of their recorded indicia have been frequently noted, and while courts must be alert to avoid the lessening of the procedural safeguards to which persons accused of bookmaking are fairly entitled, they must be equally alert to avoid the frustration of bookmaking prosecutions legitimately based on inferences which may reasonably be drawn from furtive conduct and scanty records. *Cf. State v. Kuznitz*, 36 *N. J. Super.* 521, 530 (*App. Div.* 1955), certification denied, 20 *N. J.* 136 (1955).

We are satisfied that the trial court properly denied the defendant's motion for acquittal and that the Appellate Division's ruling to the contrary was erroneous. We are also satisfied that there is no merit to the defendant's present alternative contention that the verdict of the jury was against the weight of the evidence. The State's case was not at all weakened by anything introduced on the defendant's case; on the contrary it was strengthened by the incredibility of the defendant's explanatory testimony and the jury acted well within its province in reaching its verdict of guilty. In any event, the rule is well settled that this court will not set aside a jury verdict in the absence of a clear and convincing showing that the verdict was the result of mistake, partiality, prejudice or passion. No such showing has been made and we have no hesitancy in concluding that, within the aforementioned rule and on the basis of all of

the evidence in the case, the jury's verdict may not be disturbed. See *State v. Goodman, supra,* 9 *N. J.,* at *p.* 582; *cf. State v. Dunphy,* 24 *N. J.* 10, 17 (1957); *State v. Smith, supra,* 32 *N. J.,* at *pp.* 523–524.

The judgment of the Appellate Division is reversed and the judgment of conviction entered in the Somerset County Court is reinstated.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.